UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRENT FOX,

                              Plaintiff,

          -v-

THE INTERNATIONAL CONFERENCE OF
FUNERAL SERVICE EXAMINING BOARDS
and DEBORAH H. ORECKI in her individual
and official capacity,

                              Defendants.

No. 15-CV-3905 (KMK)

OPINION & ORDER

<u>Appearances:</u>

Brian S. Sokoloff, Esq.
Kaitlyn R. McKenna, Esq.
Mark A. Radi, Esq.
Sokoloff Stern LLP
Carle Place, NY
*Counsel for Plaintiff*

David P. Zaslowsky, Esq.
Jennifer Semko, Esq.
Baker & McKenzie LLP
New York, NY
Washington, DC
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Trent Fox ("Plaintiff") filed this Action against Defendants Deborah Orecki

("Orecki") and the International Conference of Funeral Service Examining Boards (the

"Conference," and collectively "Defendants"), alleging that Defendants breached a contract and

violated his constitutional rights.  (*See generally* Am. Compl. (Dkt. No. 25).)  Plaintiff is also

seeking certain declaratory relief, including a declaration that the Conference's copyrights are

invalid and that certain provisions of a non-disclosure agreement are unconscionable. Before the Court are Defendants' Motions To Dismiss the Amended Complaint (the "Motions") pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. Nos. 35, 38.) The Conference is seeking to dismiss every cause of action except for Plaintiff's breach of contract claim (claim 5). Orecki is seeking the dismissal of all of the causes of action asserted against her. For the reasons explained herein, Orecki's Motion is denied as moot because Plaintiff has withdrawn all claims against her with prejudice, (*see* Dkt. No. 58), and the Conference's Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's Amended Complaint, and are taken as true for the purpose of resolving the Conference's Motion.

Plaintiff is a licensed funeral director and embalmer in New York. (Am. Compl. ¶ 68.) From October 2006 through April 2008, he attended the American Academy McAllister Institute of Funeral Service, Inc. ("AAMI"), (*id.* ¶ 70), which is an accredited educational institution that provides education and training to funeral service students, (*id.* ¶ 50). Its programs also include preparing students to take the National Board Exam ("NBE"), (*id.* ¶ 1), the exam students must pass to become licensed funeral directors and embalmers in New York and other states, (*id.* ¶¶ 23, 42). The NBE is created and administered by the Conference. (*Id.* ¶ 1.)

The Conference is a non-profit 501(c)(3) corporation organized under the laws of Indiana and comprised of all of the state funeral service regulatory agencies, including the New York State Department of Health Bureau of Funeral Directing (the "DOH"), and several Canadian funeral service regulatory boards. (*Id.* ¶¶ 11, 13.) Plaintiff alleges that the Conference is a "state actor and quasi-governmental body, whose purpose is to administer licensing examinations on

behalf of, with the cooperation of, and under the direction of" New York State.  (*Id.* ¶ 12.)
Orecki is a former member of the Conference Board of Directors, serving as the "Director for
District 1," which includes New York.  (*Id.* ¶ 14.)  She also was a "public official in the State of
New York, serving as Director of [DOH]."  (*Id.*)

The NBE is comprised of two sections, an arts section and a sciences section, and is
administered at a testing center on a computer.  (*Id.* ¶¶ 44, 77.)  Plaintiff took the arts and
sciences sections of the NBE on April 21, 2008, and re-took the arts section on May 23, 2008.
(*Id.* ¶ 75.)  Ultimately, he passed both sections and his scores were certified to the DOH.  (*Id.*
¶¶ 76, 83.)

Plaintiff alleges that he entered into two different contracts with the Conference before
taking the NBE.  Plaintiff states that the first contract (the "Test-Taker Agreement") consists of
an agreement whereby Plaintiff paid the Conference a fee in exchange for the Conference's
promise to "fairly administer and grade the NBE" and certify his passing scores to the state
regulatory agencies of his choosing.  (*Id.* ¶ 187.)  The second contract is a non-disclosure
agreement (the "Non-Disclosure Agreement") to which Plaintiff assented "minutes before"
taking the NBE.  (*Id.* ¶ 77.)  Plaintiff alleges that he was confronted by a prompt on the computer
screen stating, in relevant part:

> You are expressly prohibited from disclosing, publishing, reproducing, or
> transmitting this exam, in whole or in part, in any form or by any means, verbal or
> written, electronic or mechanical, for any purpose, without the prior express written
> permission of the [Conference].
>
> [. . .]
>
> By selecting the "**Yes, I agree.**" button, you signify that you have read, understand
> and agree to the terms of this agreement.  If you do not agree to the terms of this
> agreement, select the "**No, I do not agree.**" button and see the test administrator.
> Please note that you will forfeit your exam fees and the session will end.

(*Id.* ¶¶ 199–200 (internal quotation marks omitted).)  Another provision required Plaintiff to acknowledge that he had not been provided access to any examination questions in advance of the exam.  (*Id.* ¶ 81.)  Plaintiff was given "only three minutes" to review these terms but ultimately accepted them.  (*Id.* ¶ 78.)  He alleges that he did not fully understand the terms of the Non-Disclosure Agreement before accepting them and that the terms amounted to a contract of adhesion.  (*Id.*)

In 2011, Plaintiff passed the state counterpart to the NBE and received a New York State funeral director and embalming license.  (*Id.* ¶ 85.)  Since that time he has served as a funeral director at a funeral home in New York.  (*Id.* ¶ 84.)  In October 2014, Plaintiff requested that the Conference send his NBE scores to the Missouri State Board of Embalmers & Funeral Directors (the "Missouri Licensing Board"), also a member of the Conference.  (*Id.* ¶¶ 13, 88.)  Like in New York, Missouri law requires that applicants pass the NBE before receiving a license.  (*Id.* ¶ 42.)  Plaintiff alleges that the Conference either declined to certify his scores to the Missouri Licensing Board, or notified it that his scores were invalidated.  (*Id.* ¶ 90.)  His application for a Missouri license remains pending.  (*Id.* ¶ 91.)

On October 2, 2014, the Conference sent a letter to Plaintiff "requesting a response to allegations that the Conference had credible evidence of [Plaintiff's] participation in a security breach involving the harvesting and sharing of [NBE] items at [AAMI]."  (Decl. of Dalene Paull in Supp. of the Conference's Mot. To Dismiss ("Paull Decl.") Ex. 4, at 1 ("October 2014 Letter") (Dkt. No. 37); *see also* Am. Compl. ¶ 92).)[1]  It noted that "any requests for recognition of

---

[1] The Court can consider the October 2014 Letter because Plaintiff references and quotes from it in the Amended Complaint.  *See EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 224 n.2 (S.D.N.Y. 2012) (considering a document supplied by the defendants on a motion to dismiss because the complaint referred to and quoted from the document).

[Plaintiff's] previous NBE results . . . [would] be placed on hold pending the resolution of the current allegations." (October 2014 Letter 1.)  Attached to the letter were emails Plaintiff sent to various individuals discussing the NBE questions he encountered on the exams he took.  (*See id.* at 3–5.)[2]  The security breach referenced in the letter related to a lawsuit the Conference brought against AAMI, alleging that AAMI induced students to improperly share confidential details regarding the NBE, including their recollection of exam questions, and then disseminating those questions to other students.  (Am. Compl. ¶ 53.)  The suit was settled in December 2014.  (*Id.*)  Plaintiff alleges that the Conference was dissatisfied with the settlement and "decided to arbitrarily and capriciously retroactively punish AAMI students." (*Id.* ¶ 54.)  In furtherance of this campaign, the Conference "developed a policy and practice of summarily retroactively invalidating the passing scores of numerous students who had contact with AAMI . . . faculty . . . either before or after they took the exam." (*Id.* ¶ 56 (internal quotation marks omitted).)

Following a series of communications spurred on by the October 2014 Letter, (*id.* ¶¶ 96–100), the Conference notified Plaintiff that "based upon available evidence and a directive of the Conference Board of Directors (BOD) it has been determined that [Plaintiff] provided items recalled from the NBE back to AAMI personnel after his test administration," (*id.* ¶ 101 (alterations and internal quotation marks omitted)).  Thereafter, the Conference imposed several sanctions.  It invalidated Plaintiff's NBE scores, barred him from retaking the NBE for five years, fined him $500, and "threatened that any score transfers to state licensing boards would be accompanied with a notice that the scores had been invalidated." (*Id.* ¶ 102.)  Plaintiff alleges that the Conference failed to conduct a good-faith investigation before imposing these sanctions

---

[2] Plaintiff alleges that the October 2014 Letter "contained only general boilerplate allegations and contained no information specific to Plaintiff." (Am. Compl. ¶ 94.)  This allegation is untrue.  The attachments to the letter pertained directly to Plaintiff.

and did not provide any notice that these sanctions were possible or provide an opportunity to respond.  (*Id.* ¶¶ 105–06.)  He states that he did not "disclose any trade secrets, copyrighted, copyrightable, or otherwise protected, confidential, or privileged information about the NBE." (*Id.* ¶ 103.)

Plaintiff alleges that the Conference has been delegated a public function by New York State because it engages in the "state function of creating and administering the exams the state requires for state licensure, creating criteria for licensing (by deciding when individuals can take the NBE), and imposing punishments on both licensees and license applicants."  (*Id.* ¶ 135.)  The Conference is allegedly a state actor because only government regulators are members, New York pays dues to the Conference, New York officials attend Conference meetings, New York uses taxpayer funds so that officials can attend Conference meetings, and the DOH participates in the election of the Conference Board of Directors.  (*Id.* ¶¶ 118–24.)  According to Plaintiff, without state participation the Conference would not exist.  (*Id.* ¶ 125.)  In other words:

> The Conference is an organization exclusively composed of current state regulators required by state law to (1) examine funeral director and embalming license applicants, and (2) discipline licensees with appropriate punishment.  The Conference, acting through those state regulators—and only through state regulators, in turn (a) develops exams, (b) sets the method of grading the exams, (c) sets the passing score for the exams, (d) prescribes the cost to license applicants for taking the exam, (e) conditions an applicant's right to take the exam on his or her alleged agreement to forfeit constitutional and other civil rights protections, (f) decides who may—and may not—take its exams, i.e., setting de facto license qualifications and penalties, (g) imposes monetary fines for perceived infractions of Conference rules, without payment of which an applicant cannot receive a State license, and (h) engages in both the prosecution and jury function regarding perceived violations of Conference rules.  By ceding these myriad State functions to the Conference, New York has adopted them as its own.

(*Id.* ¶ 131 (italics omitted).)

As state actors, Defendants allegedly violated Plaintiff's procedural and substantive due process rights, the First Amendment, and the Equal Protection Clause of the Fourteenth

Amendment by invalidating Plaintiff's NBE scores and imposing the other sanctions.  Plaintiff also has asserted several causes of action relating to the contracts between him and the Conference: (1) a claim for breach of the Test-Taker Agreement; and (2) causes of action seeking declarations that the Non-Disclosure Agreement is unenforceable and unconstitutional. Plaintiff further asserts a series of copyright claims against the Conference on the ground that the Conference's decision to sanction him stems from the fact that Plaintiff violated the Conference's copyrights.  He seeks: (1) a declaration of fair use; (2) a declaration of implied license; (3) a declaration of non-infringement; and (4) a declaration of invalid copyrights. Finally, Plaintiff seeks a declaration that the five-year ban on retaking the NBE is illegal.

B.  Procedural History

Plaintiff initiated this Action by filing a Complaint on May 21, 2015.  (Dkt. No. 1.) Thereafter, Defendants filed a pre-motion letter requesting leave to file motions to dismiss the Complaint.  (Dkt. No. 16.)  At the Pre-motion Conference held on October 7, 2015, the Court directed Plaintiff to file an Amended Complaint by no later than October 28, 2015.  (Dkt. No. 24.)  Plaintiff filed the Amended Complaint on October 28, 2015.  (Dkt. No. 25.)  The Parties simultaneously submitted the Motions and their papers on March 11, 2016.  (Dkt. Nos. 35–44.) On January 6, 2017, the Court solicited supplemental briefing on the issue of whether New York law applied to certain of Plaintiff's causes of action.  (Dkt. No. 47.)  Defendants submitted a supplemental brief on January 13, 2017, (Dkt. No. 48), and Plaintiff filed a reply on January 20, 2017, (Dkt. No. 51).  The Court heard oral argument on March 2, 2017.  (*See* Dkt. (minute entry for Mar. 2, 2017).)

On March 8, 2017 (and six days after oral argument), Plaintiff filed a letter with the Court seeking to dismiss without prejudice certain, but not all, of the claims asserted in his Amended

Complaint, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A).  (*See* Dkt. No. 53.)

Specifically, Plaintiff sought to dismiss Orecki and all of the federal claims asserted against the

Conference, but asked the Court to retain jurisdiction over three state-law causes of action

asserted against the Conference.  (*See id.*)  Defendants filed a response requesting that the claims

be dismissed with prejudice.  (Dkt. No. 54.)  On March 10, 2017, the Court issued an Order,

explaining that Rule 41(a)(1)(A) does not allow a plaintiff to dismiss only some of the claims

asserted against a defendant.  (*See* Dkt. No. 55.)  In other words, Plaintiff had to dismiss all of

the claims asserted against the Conference for his notice of dismissal to be effective.  (*See id.*

(citing *Seidman v. Chobani, LLC*, No. 14-CV-4050, 2016 WL 1271066 (S.D.N.Y. Mar. 29,

2016)).)  In response to the Order, Plaintiff filed a letter seeking to amend the Amended

Complaint pursuant to Fed. R. Civ. P. 15(a)(2).  (Dkt. No. 56.)  Defendants opposed this request.

(Dkt. No. 57.)  The Court denied Plaintiff's request to file an amended pleading and directed him

to inform the Court whether he intended to withdraw all of the claims asserted against the

Conference.  (Dkt. No. 59.)  On March 13, 2017, Plaintiff filed a letter withdrawing all of the

claims asserted against Orecki with prejudice.  (Dkt. No. 58.)  Plaintiff chose not to withdraw the

claims asserted against the Conference.  (*Id.*)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of

his [or her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007) (second alteration in original) (citations omitted).  Instead, the Supreme Court

has emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.*, and that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563.  A plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570. But if a plaintiff has "not nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed."  *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

For purposes of the Conference's Motion, the Court is required to consider as true the factual allegations contained in the Amended Complaint.  *See Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) ("We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint and drawing all reasonable inferences in the plaintiff's favor." (italics and internal quotation marks omitted)); *Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008) (same).  "In adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted).

B.  Analysis

      1.  Plaintiff's Constitutional Claims Against the Conference

Plaintiff's first, second, third, fourth, and seventh causes of action are brought pursuant to

42 U.S.C. § 1983 or are premised on the fact that the Conference is a governmental body.  In

short, Plaintiff claims that the Conference violated his procedural (first cause of action) and

substantive (second cause of action) due process rights, violated his First Amendment right to

free speech (third cause of action), and violated the Equal Protection Clause of the Fourteenth

Amendment (fourth cause of action) by sanctioning him, and drafted the Non-Disclosure

Agreement in such a way that it is unconstitutionally overbroad (seventh cause of action).  (*See*

Am. Compl. ¶¶ 133–84, 211–17.)  The Conference argues that all of these claims must be

dismissed because it is not a state actor.  (Conference Mem. of Law in Supp. of Mot. To Dismiss

("Conference Mem.") 6 (Dkt. No. 36).)[3]

      Under § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage . . . subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or other proper proceeding for
> redress.

The Supreme Court has explained that "[t]he purpose of § 1983 is to deter state actors from using

the badge of their authority to deprive individuals of their federally guaranteed rights and to

provide relief to victims if such deterrence fails."  *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).  In

regard to private conduct, the Supreme Court has sought to "'preserve[] an area of individual

---

[3] In the alternative, the Conference argues that Plaintiff has not alleged adequately any of
his constitutional claims.  (Conference Mem. 17–28.)  Because the Court concludes that the
Conference is not a state actor, the Court declines to address this argument.

freedom by limiting the reach of federal law' and avoid[] the imposition of responsibility on a State for conduct it could not control."  *Nat'l Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982)).  "A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action."  *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003).  To constitute state action, there must be an alleged deprivation of a federal right "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor."  *Lugar*, 457 U.S. at 937; *see also Hollander v. Copacabana Nightclub*, 624 F.3d 30, 33 (2d Cir. 2010) (per curiam) (referring to and applying the "two-prong test" outlined in *Lugar*).

      "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character" that it can be regarded as governmental action. *Evans v. Newton*, 382 U.S. 296, 299 (1966); *see also Hollander*, 624 F.3d at 34 (recognizing "actions of nominally private entities are attributable to the state" under certain circumstances). A private entity, however, does not become a state actor for purposes of § 1983 merely on the basis of "the private entity's creation, funding, licensing, or regulation by the government." *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003).  "Rather, there must be such a close nexus between the state and the challenged action that the state is *responsible* for the specific conduct of which the plaintiff complains."  *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (alteration and internal quotation marks omitted).  Similarly, "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action."  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).  To establish that a private actor's

conduct is to be deemed state action, a § 1983 plaintiff must demonstrate that the state was involved in the specific activity giving rise to his or her cause of action; it is not enough to show merely that the state was involved in "some activity" of the private entity "alleged to have inflicted injury upon [the] plaintiff." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (per curiam) (emphasis and internal quotation marks omitted).

Although there is "no single test to identify state actions and state actors," *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009) (internal quotation marks omitted), three main tests have emerged:

> For the purposes of [§] 1983, the actions of a nominally private entity are attributable to the state . . . (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) when the entity has been delegated a public function by the state, ("the public function test").

*Sybalski*, 546 F.3d at 257 (alterations and some internal quotation marks omitted); *see also Hollander*, 624 F.3d at 34 (same).

The Court construes the arguments Plaintiff makes in opposition to the Motions to be that he has satisfied the joint action and public function tests.  Because Plaintiff does not argue that a state compelled the Conference to punish Plaintiff, the Court considers only the public function and joint action tests below.  Plaintiff has failed to allege that the Conference is a state actor under either of those tests.

### a.  The Public Function Test

Plaintiff contends that the Conference is a state actor for purposes of § 1983 under the "public function test" because New York State has delegated public functions to it, i.e., licensing, discipline, and occupational credentialing.  (Pl.'s Mem. of Law in Opp'n to Defs.'

Mots. To Dismiss ("Pl.'s Opp'n") 7 (Dkt. No. 44); *see also* Am. Compl. ¶ 135 ("The Conference

engages in the state function of creating and administering the exams the state requires for state

licensure, creating criteria for licensing . . . , and imposing punishment on both licensees and

license applicants.").)  The Court finds this argument unpersuasive because "[f]ederal courts

have consistently held that private entities administering examinations relied upon by the state do

not qualify . . . as state actors for purposes of [§] 1983 claims."  *Mattei v. Int'l Conference of*

*Funeral Serv. Examining Bds.*, No. 15-CV-139, 2015 WL 5125799, at *3 (W.D. Tex. Sept. 1,

2015) ("*Mattei I*"); *see also Boggi v. Med. Review & Accrediting Council*, 415 F. App'x 411,

414 (3d Cir. 2011) (holding that the National Board of Medical Examiners was not a state actor

because it did not "engage[] in any conduct that could be considered state action"); *Sanjuan v.*

*Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 250 (7th Cir. 1994) ("That states make

certification by the [b]oard a prerequisite for some public positions does not convert the [b]oard

into a state actor, any more than a state's insistence that some employees have advanced degrees

converts every college and university into a state actor."); *Langston v. ACT*, 890 F.2d 380, 384–

86 (11th Cir. 1989) (noting that the fact that public institutions rely on the ACT to evaluate

students for admissions did not make the defendant a state actor under the public function test);

*Johnson v. Educ. Testing Serv.*, 754 F.2d 20, 23–25 (1st Cir. 1985) (holding that the defendant,

which administered the Law School Admission Test, was not a state actor, even though public

law schools relied on the examination for admissions purposes); *Jaramillo v. Prof'l Examination*

*Serv., Inc.*, 515 F. Supp. 2d 292, 294–96 (D. Conn. 2007) (holding that the defendant, which

designed and graded a licensing exam, was not a state actor); *Sims v. Hassenplug*, No. 05-CV-

155, 2006 WL 2085481, at *4–5 (M.D. Ga. July 25, 2006) (holding that the defendant, which

created, monitored, and gave an examination required for state certification, was not a state

actor); *Tolleson v. Educ. Testing Serv.*, 832 F. Supp. 158, 160–63 (D.S.C. 1992) (holding that the defendant, which administered an examination required for an individual to teach Social Studies in South Carolina, was not a state actor); *Stewart v. Hannon,* 469 F. Supp. 1142, 1147–48 (N.D. Ill. 1979) (holding that the defendant was a private entity not amendable to suit under § 1983 because the defendant merely designed and graded an examination used by the Chicago Public School System).

Courts have reached the same conclusion even where the private entity creates and administers an examination that is required for state licensure.  *See Mattei I*, 2015 WL 5125799, at *3 (holding that the Conference is not a state actor); *Thomas v. NBME–Nat'l Bd. of Med. Exam'rs*, No. 13-CV-3946, 2015 WL 667077, at *4 (E.D. Pa. Feb. 13, 2015) (holding that the National Board of Medical Examiners, which offered an examination through which international medical graduates could obtain medical licensure in the United States, was not a state actor); *Jallali v. Nat'l Bd. of Osteopathic Med. Exam'rs, Inc.*, No. 12-CV-60548, 2012 WL 3151553, at *3–5 (S.D. Fla. Aug. 2, 2012) (holding that the National Board of Osteopathic Medical Examiners, Inc., was not a state actor even though the test it administered was allegedly necessary for medical licensure in all 50 states); *Mahmood v. Nat'l Bd. of Med. Exam'rs*, No. 12-CV-1544, 2012 WL 2368462, at *2–3 (E.D. Pa. June 21, 2012) (holding that the National Board of Medical Examiners was not a state actor even though it "provid[ed] testing services and exam results that states may choose to use"); *Boggi v. Med. Review & Accrediting Council*, No. 08-CV-4941, 2009 WL 2951022, at *5–9 (E.D. Pa. Sept. 15, 2009) (holding that the Medical Review and Accrediting Council, "a private organization that . . . offere[d] testing and retraining services to assist doctors in getting their medical licenses back," was not a state actor); *Metzger v. Nat'l Comm'n on Certification of Physician Assistants*, No. 00-CV-4823, 2001 WL 76331, at

*2–4 (E.D. Pa. Jan. 26, 2001) (holding that the National Commission on Certification of Physician Assistants, Inc., which administered certification exams for physician assistants, was not a state actor because it "merely provide[d] a mechanism by which a candidate [could] meet the state [certification] requirements"); *Sammons v. Nat'l Comm'n on Certification of Physician Assistants*, 104 F. Supp. 2d 1379, 1382–83 (N.D. Ga. 2000) (holding that the National Commission on the Certification of Physician Assistants, Inc., was not a state actor); *Zamani v. Am. Dental Ass'n*, No. 98-CV-1022, 1998 WL 812545, at *5–6 (N.D. Ill. Nov. 18, 1998) (holding that the American Dental Association was not a state actor where the plaintiff alleged that the examinations it administered were "a prerequisite to receiving a license to practice dentistry in New York" (internal quotation marks omitted)); *Staudinger v. Educ. Comm'n for Foreign Med. Graduates*, No. 92-CV-8071, 1993 WL 138954, at *4–5 (S.D.N.Y. Apr. 28, 1993) (holding that the Educational Commission for Foreign Medical Graduates, which certified foreign medical school graduates applying to residency programs in the United States, was not a state actor because "testing and otherwise certifying that foreign medical school graduates are qualified to practice medicine" is not an exclusively public function); *accord Kurbatsky v. Int'l Conference of Funeral Serv. Examining Bds.*, Index No. 8821-15 (N.Y. Sup. Ct. Jan. 23, 2017) (dismissing constitutional claims asserted against the Conference on the ground that it is not a state actor).[4]

The court's decision in *Mattei I* is particularly relevant to the facts of this case because Plaintiff's claims are nearly identical to the claims raised there. In *Mattei I*, the plaintiff attended AAMI and the Conference accused him of participating in the scheme to share confidential NBE

---

[4] Defendants notified the Court of the *Kurbatsky* decision shortly after it was decided. (*See* Dkt. No. 50.)

testing information.  The Conference invalidated his NBE scores, barred him from retaking the exam for five years, and informed the Texas Funeral Service Commission of the allegations, which allegedly instituted an action to revoke the plaintiff's license in Texas.  *Mattei I*, 2015 WL 5125799, at *1.  As in New York and Missouri, a passing score on the NBE is required in Texas before the state will issue a license to individuals seeking to become funeral directors and embalmers.  *Id.*  The plaintiff alleged that the Conference was a state actor and asserted several claims pursuant to § 1983.  The court disagreed, holding that "a private entity that administers a standardized exam and reports the scores to the state for purposes of licensure, but lacks the authority to make decisions regarding the processing and issuance of such licenses, is not a state actor for purposes of [§] 1983."  *Id.* at *4.

Plaintiff argues that *Mattei I* and the cases cited above are inapposite and points to several cases that he claims are more instructive.  Many of the cases Plaintiff relies upon, however, are easily distinguishable because they do not involve the creation and administration of standardized exams.[5]  For example, Plaintiff cites *St. Agnes Hospital of City of Baltimore, Inc.*

---

[5] Several of the cases to which Plaintiff cites do not merit much discussion.  *See Chudacoff v. Univ. Med. Ctr. of S. Nev.*, 649 F.3d 1143 (9th Cir. 2011); *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545 (5th Cir. 2005); *Rouse v. Judges of Circuit Court of Cook Cty.*, 609 F. Supp. 243 (N.D. Ill. 1985); *Granberg v. Ashland County*, 590 F. Supp. 1005 (W.D. Wis. 1984).  In *Chudacoff*, the defendant was a public hospital, not a testing company.  649 F.3d at 1146.  In *Cornish*, the defendant acted "under color of state law in providing juvenile correctional services" to a municipality, but not when it decided to terminate the plaintiff's employment.  402 F.3d at 550.  In *Rouse*, the defendant performed the "public function of screening" the applications of people seeking to become judges.  609 F. Supp. at 247.  And in *Granberg*, the defendant ran a statutorily-mandated alcohol rehabilitation program for determining whether the participants were qualified for driver's licenses.  The court found that "licensing persons for the privilege of driving motor vehicles on public highways, determining whether a person is qualified for a license, and imposing conditions, static or continuing, for retention of a license already granted, [were] quintessential state functions."  590 F. Supp. at 1008.  These cases, while helpful in displaying the variety of situations in which courts have found state action, have little bearing on whether developing and administering the NBE constitutes state action.

*v. Riddick*, 668 F. Supp. 478 (D. Md. 1987), for the proposition that courts deem private entities to be state actors where the state outsources licensing decisions to private entities.  In *St. Agnes*, the hospital-plaintiff challenged the withdrawal of the accreditation of its residency training program by the defendant, the chairman of the Accreditation Council for Graduate Medical Education ("ACGME").  At the time, under Maryland law, to become a licensed physician, a person was required to be trained in a residency program accredited by the ACGME.  The court noted that the state, by delegating to ACGME the authority to determine which residency programs were accredited, effectively gave to ACGME the ability to determine "how a person must be trained in order to qualify for a physician's license."  *Id.* at 480.  It held that ACGME was engaged in state action due to the close connection between the state function of "licensing . . . physicians" and ACGME's accreditation powers.  *Id.* at 481.  Here, unlike in *St. Agnes*, the Conference has no say in how a person must be trained in order to obtain a funeral director's license.  Moreover, in *St. Agnes*, the ACGME had the authority to unilaterally revoke the plaintiff's certification.  The Conference does not possess such a power.  Its only role in the licensing process is the administration of the NBE.  Indeed, Plaintiff acknowledges that his New York license has been unaffected by the penalties the Conference imposed.  (*See* Am. Compl. ¶ 84.)[6]

        The cases to which Plaintiff cites that do involve testing regimes are similarly inapposite. *See Yedniak v. Educ. Testing Serv.*, No. 85-CV-3953, 1985 WL 3100 (E.D. Pa. Oct. 16, 1985); *Golden Rule Life Ins. Co. v. Mathias*, 408 N.E.2d 310 (Ill. App. 1980).  In *Yedniak*, the court assumed that the testing company defendant satisfied the state action requirement, but dismissed

---

[6] Plaintiff's counsel represented at oral argument that Plaintiff remains licensed in New York.

the action as "frivolous."  1985 WL 3100, at *1.  In *Golden Rule*, the test preparation company defendant's actions went well beyond the development and administration of an exam.  The defendant processed license applications and printed licenses for those who passed.  408 N.E.2d at 315–16.  The Conference performs neither of those functions.

Plaintiff has identified one court—a state court in Montana—that has held that the Conference may be a state actor.  In *Stevenson v. International Conference of Funeral Service Examining Boards*, No. ADV-2015-646 (Mont. Dist. Ct. Apr. 4, 2016), the court held that the plaintiff had sufficiently alleged that the Conference was a state actor.  (*See* Letter from Brian Sokoloff, Esq., to Court (Apr. 6, 2016) Ex. 1 (Dkt. No. 45).)[7]  Montana's rules of civil procedure, however, are different than the federal rules.  Under Montana's rules, "[a] complaint should not be dismissed under Rule 12(b)(6) unless it appears beyond a doubt that the plaintiff can prove no set of facts to support his claim which would entitle him to relief."  (*Id.* at 6.)  Under the federal rules, as noted, Plaintiff must state a "plausible claim for relief."  *Iqbal*, 556 U.S. at 679.  Moreover, the Court, which is not bound to follow *Stevenson*, is unpersuaded by the reasoning of *Stevenson*, and, in particular, its omission of *Tarkanian* in evaluating whether the Conference is a state actor.  In short, the cases upon which Plaintiff relies are insufficient to overcome the overwhelming weight of authority holding that private entities in the business of administering examinations, like the Conference, are not state actors.

Even if the Conference were engaged in a public function, under the public function test, "the relevant question is not simply whether a private group is serving a 'public function.'"  *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982).  Rather, "the question is whether the function performed [by the private entity] has been 'traditionally the *exclusive* prerogative of the State.'"

---

[7] Plaintiff submitted a copy of *Stevenson* for the Court's consideration.

*Id.* (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974)) (emphasis in *Rendell-Baker*); *see also Langston*, 890 F.2d at 384 ("The Supreme Court has emphasized that a mere showing that a private person performs a public function is not enough to establish state action.").  Plaintiff has failed to meet that standard here because "the formulation, grading, and reporting of standardized tests is not an *exclusive* public function."  *Johnson*, 754 F.2d at 25 (emphasis added); *see also Staudinger*, 1993 WL 138954, at *4 ("The work performed by [the defendant]—testing and otherwise certifying that foreign medical school graduates are qualified to practice medicine—does not fall within the narrow category of functions which have been considered exclusively the State's.").

Plaintiff argues that the Conference is nonetheless a state actor because it is engaged in the traditional governmental function of occupational licensing, (Pl.'s Opp'n 10), but he has mischaracterized the Conference's role in the licensing process.[8]  The Conference does not issue licenses to or vet persons seeking to become funeral directors.  As Plaintiff acknowledges, "[u]nder New York law, the *DOH is responsible for the regulation, licensing, examination, and discipline of funeral directors and embalmers*."  (*Id.* at 11 (emphasis added).)  While a passing score on the NBE is required before an individual can obtain a license, *see* N.Y. Pub. Health Law § 3421, the decision as to whether to award a license rests exclusively with the state.  In other words, "the Conference merely administers a standardized exam upon which public entities rely[;] [it] has no authority over the decisions made by such entities."  *Mattei I*, 2015 WL

---

[8] Along these lines, Plaintiff argues that the Conference is a state actor because it "determin[es] who may sit for . . . state licensing exam[s]."  (Pl.'s Opp'n 18.)  The Conference, however, does not decide who may sit for state licensing exams, it controls only who may sit for the NBE.  Although passing scores on the NBE are required to obtain licenses in certain states, as already discussed, administering an exam is not a public function.

5125799, at *4; *see also Langston*, 890 F.2d at 384–85 (holding that designing and administering a test relied on by public institutions did not render the defendant a state actor).

Plaintiff argues next that "[e]ven if the Conference is not a state actor in general regarding administering licensing exams, . . . it is, at the least, a state actor regarding the discipline" it imposed on him.  (Pl.'s Opp'n 14.)  Plaintiff has cited no authority to support this proposition, and there is no allegation that the states have delegated to the Conference the ability to sanction license holders *on behalf* of any particular state.  Plaintiff contends that the "punishment of licensees . . . is reserved to the State exclusively," (*id.* at 18), but the Conference did not derive its power to punish Plaintiff from New York or Missouri law, and neither of those states authorized the Conference to impose the punishments it did.  Plaintiff was sanctioned by the Conference in its capacity as the overseer of the NBE, not as an agent of the DOH or any other state regulatory agency.  Indeed, the Amended Complaint is devoid of an allegation that *any* state licensing agency has independently punished Plaintiff.

Furthermore, the court in *Mattei* addressed this very same argument in ruling on the plaintiff's motion to reconsider its ruling in *Mattei I*.  (*See* Paull Decl. Ex. 3 ("*Mattei II*").)  It held that the Conference was not a state actor when it sanctioned the plaintiff because "[t]he Conference d[id] not derive its power from Texas, and Texas did not authorize or compel the Conference to investigate AAMI or invalidate [the] [p]laintiff's NBE score." (*Mattei II* 6.)  The same goes in this case.  Therefore, the Conference was not engaged in state action when it sanctioned Plaintiff.

Plaintiff argues finally that the Conference was engaged in state action because its decision to invalidate his NBE scores effectively bars him from working as a funeral director.

(Pl. Opp'n 15.)[9]  He contends that neither the Conference nor the court in *Mattei I* cited to a single case where a testing agency effectively banned the test-taker from practicing his chosen profession, (*id.*), but as noted, the Conference does not decide whether a person should be a state-licensed funeral director.  While the invalidation of Plaintiff's NBE scores and the ban on retaking the NBE might result in Plaintiff not receiving a license in Missouri, that decision will be made by the State of Missouri, not the Conference.  Indeed, the fact that New York has not suspended Plaintiff's license, even after the Conference's sanction, is concrete proof of the distinctive roles of the Conference and each state.

In sum, Plaintiff has not alleged that the Conference is performing an exclusively public function.  The New York and Missouri legislatures have decided to delegate to the Conference the testing of individuals seeking to become funeral directors and embalmers.  Neither state, however, has delegated to the Conference the authority to make actual licensing decisions.  That authority rests solely with the respective state agencies.  While true that New York and Missouri require passing scores on the NBE before issuing a license, courts have consistently held that private entities creating and administering exams relied upon by public entities are not state actors, even when the test relates to medical licensing.  Nor has Plaintiff cited to any authority holding that testing companies become state actors when they punish test-takers who violate rules regarding test confidentiality.  Even if Plaintiff were to come forward with such authority, the Conference did not punish him on behalf of any state.  Plaintiff was punished only because he allegedly participated in AAMI's scheme to collect and distribute NBE exam questions and information.

---

[9] The Court notes that this argument is in conflict with Plaintiff's concession that he remains a licensed funeral director in New York.  (*See* Am. Compl. ¶ 84.)

b.  The Joint Action Test

Plaintiff argues that the "Conference's nature and its functions" make it a state actor.  (*Id.*
at 12.)  He focuses on the fact that the Conference's membership is composed entirely of state
regulatory agencies, that New York uses taxpayer funds to participate in the affairs of the
Conference, and that New York government officials participate in those same affairs as a part of
their official duties.  (*Id.*)[10]  In essence, Plaintiff is arguing that the Conference is itself a state
actor because its members are comprised entirely of state actors, i.e., state licensing boards.  In
response, the Conference argues that the Supreme Court, in *Tarkanian*, rejected a similar
argument and therefore Plaintiff has not alleged state action.  (Conference Mem. 14–17.)

In *Tarkanian*, the University of Nevada Las Vegas ("UNLV") suspended its men's
basketball coach—the plaintiff—based on a report issued by the National Collegiate Athletic
Association ("NCAA")—"an unincorporated association of approximately 960 members,
including virtually all public and private universities and 4-year colleges conducting major
athletic programs in the United States," 488 U.S. at 183—detailing an investigation that revealed
a series of NCAA rules violations.  *Id.* at 181.  The NCAA threatened to take further action
against UNLV unless it severed all ties with the plaintiff.  *Id.*  After being suspended, the
plaintiff sued both UNLV and the NCAA pursuant to § 1983.  The question before the Supreme
Court was whether the NCAA engaged in state action when it conducted its investigation into the
violations and recommended that the plaintiff be disciplined.

---

[10] The mere fact that the Conference receives public funds does not render it a state actor.
*See Rendell-Baker*, 457 U.S. at 832–33, 843 (rejecting "state action" argument for employment
terminations effected by a private school that (1) received 90–99% of its funding from the state;
(2) was subject to state regulation; and (3) contracted with the state to perform certain services
for students); *Liburd v. Bronx Lebanon Hosp. Ctr.*, No. 07-CV-11316, 2008 WL 3861352, at *8
(S.D.N.Y. Aug. 19, 2008) ("[A] predominance of public funding is not conclusive evidence of
state action.").

The plaintiff argued that the NCAA was a state actor because UNLV "delegated its own functions to the NCAA, clothing the Association with authority both to adopt rules governing UNLV's athletic programs and to enforce those rules on behalf of UNLV." *Id.* at 192. The Supreme Court determined that the NCAA was not a state actor because the NCAA was comprised of institutions spread throughout the United States and therefore operated as "an organization that [was] independent of any particular State." *Id.* at 193. The Court also found that "[n]either UNLV's decision to adopt the NCAA's standards nor its minor role in their formulation [was] a sufficient reason for concluding that the NCAA was acting under color of Nevada law when it promulgated standards governing athlete recruitment, eligibility, and academic performance." *Id.* at 195.

Plaintiff argues this case is unlike *Tarkanian*, relying on the Supreme Court's decision in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001). (Pl.'s Opp'n 12.) But *Brentwood Academy* is distinguishable because the entity deemed to be a state actor was comprised solely of public and private high schools in the state of Tennessee. 531 U.S. at 290; *see also id.* at 298 (describing the entity as "an organization whose member public schools are all within a single State"). Like the NCAA in *Tarkanian*, the Conference, while made up of state officials, is independent of any particular state. Indeed, Plaintiff has failed to identify under color of what state law the Conference acted in deciding to invalidate his NBE scores. He alleges instead that the Conference's membership consists of all of the "governmental state licensing boards of the United States and four provinces of Canada." (Am. Compl. ¶ 26.) Yet, it is precisely "[b]ecause the Conference's membership is comprised of public entities from all [50] states, [that] the Conference does not act under the color of law of

any one state, and is not a state actor for purposes of [§] 1983." *Mattei I*, 2015 WL 5125799, at

\*4.  The constitutional claims asserted against the Conference thus fail as a matter of law.

### 2.  The Non-Disclosure Agreement

For his sixth cause of action, Plaintiff seeks a declaration that the Non-Disclosure

Agreement that he signed moments before taking the NBE is unenforceable.  (Am. Compl.

¶¶ 198–210.)  The Conference contends that this claim should be dismissed because it is

duplicative of his breach of contract claim (claim 5).  (Conference Mem. 29.)  In the alternative,

the Conference argues that Plaintiff has failed to state a cause of action based on alleged

unconscionability.  (*Id.*)

Plaintiff explains that his breach of contract claim and his declaratory judgment claim are

not duplicative because they concern two different agreements.  (Pl.'s Opp'n 31.)  The breach of

contract claim is based on the Test-Taker Agreement and the Non-Disclosure Agreement is

alleged as a separate contract.  (*Id.*)  Because neither Party has submitted the contract governing

their relationship, the Court will assume for purposes of this Opinion that the Non-Disclosure

Agreement and the Test-Taker Agreement are separate contracts.

"Under New York law, a contract is unconscionable when it is so grossly unreasonable or

unconscionable in light of the mores and business practices of the time and place as to be

unenforceable . . . according to its literal terms."  *Ragone v. Atl. Video at Manhattan Ctr.*, 595

F.3d 115, 121 (2d Cir. 2010) (internal quotation marks omitted); *see also Fallon v. Berney*, 592

N.Y.S.2d 860, 862 (App. Div. 1993) ("To be found unconscionable, a contract must be so

grossly unreasonable in the light of the mores and business practices of the time and place as to be unenforceable.").[11]

> Generally, there must be a showing that such a contract is both procedurally and substanti[vely] unconscionable. The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract, per se.

*Ragone*, 595 F.3d at 121–22 (citation, alteration, and internal quotation marks omitted); *see also Cybercreek Entm't, LLC v. U.S. Underwriters Ins. Co.*, No. 16-CV-424, 2016 WL 7374233, at *5 (W.D.N.Y. Dec. 20, 2016) ("Procedural unconscionability examines the contract-formation process and focuses on 'the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was a disparity in bargaining power.'" (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988)). "Absent some violation of law or transgression of a strong public policy, the parties to a contract are basically free to make whatever agreement they wish, no matter how unwise it might appear to a third party." *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 569 (N.Y. 1978).

Here, the Non-Disclosure Agreement stated: "You are expressly prohibited from disclosing, publishing, reproducing, or transmitting this exam, in whole or in part, in any form or by any means, verbal or written, electronic or mechanical, for any purpose, without the prior

---

[11] The Parties assume that New York law applies to this question. The Court therefore also assumes that New York law governs this dispute. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law." (internal quotation marks omitted)); *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir. 1995) ("Because both parties agree that New York cases are controlling, we shall assume that New York law governs this diversity action.").

express written permission of the [Conference]." (Am. Compl. ¶ 199 (internal quotation marks omitted).) Plaintiff contends that this agreement is procedurally unconscionable because the Conference possessed superior bargaining power, because Plaintiff was given only three minutes to review these terms, and because Plaintiff had no choice but to accept the terms since refusing would have precluded him from obtaining the necessary exam scores to receive a funeral director's license. (Pl.'s Opp'n 32.) The agreement is substantively unreasonable, Plaintiff contends, because it "was vague and overbroad, failing to give [him] notice of exactly what it prohibited." (*Id.*)

Even assuming that the Non-Disclosure Agreement is procedurally unconscionable—which the Court seriously doubts—Plaintiff's claim fails because he has not alleged that the agreement is substantively unconscionable. *See Ragone*, 595 F.3d at 121 (explaining that plaintiffs must generally show both substantive and procedural unreasonableness). Indeed, the Amended Complaint focuses almost exclusively on the procedural reasonableness of the agreement. (*See* Am. Compl. ¶ 203 (alleging Plaintiff was given only three minutes to review the terms and was not given an opportunity to negotiate or consult an attorney); *id.* ¶ 205 (alleging that Plaintiff did not fully understand the terms); *id.* ¶ 207 (alleging that there was a gross inequality in bargaining power between Plaintiff and the Conference).) With respect to substantive reasonableness, Plaintiff alleges only that the agreement was unfair because he had to choose between accepting its terms or forgoing his chosen career. (*Id.* ¶ 209.) That allegation, however, focuses solely on the conditions surrounding Plaintiff's decision to assent to the Non-Disclosure Agreement and not the reasonableness of its terms. The agreement required Plaintiff to keep confidential the NBE exam questions he saw on the tests that he took. Yet, "[t]here is nothing shocking about the Conference imposing a confidentiality requirement before

26

disseminating information in which it claims a copyright and proprietary interest." *Mattei I*, 2015 WL 5125799, at *9; *see also Croote-Fluno v. Fluno*, 734 N.Y.S.2d 298, 299 (App. Div. 2001) (explaining that "[t]o be unconscionable, an agreement must shock the conscience" (internal quotation marks omitted)); *Yeager v. Educ. Testing Serv.*, 551 N.Y.S.2d 574, 576 (App. Div. 1990) (noting that there is a "clear public interest in reporting valid test scores").[12]  Nor is there anything vague or overbroad about the Non-Disclosure Agreement's terms.  It clearly and expressly prohibits test-takers from discussing or sharing NBE content without first obtaining express permission.  The Conference has a legitimate interest in keeping NBE questions confidential because test-takers who have advance notice of the questions to expect have an unfair advantage over other test-takers.  Plaintiff's unconscionability claim thus fails as a matter of law.  *See Cybercreek Entm't*, 2016 WL 7374233, at *5–7 (dismissing the plaintiff's unconscionability claim with prejudice because the plaintiff failed to allege either procedural or substantive unconscionability).  Accordingly, it is dismissed.

### 3.  The Copyright Claims

Plaintiff has asserted four copyright-related claims.  He argues that the Conference invalidated his NBE scores and banned him from retaking the NBE because he disclosed copyrighted information.  (Pl.'s Opp'n 33.)  He is seeking declarations of (1) fair use, (2) implied license, (3) non-infringement, and (4) a declaration that the Conference's copyrights are invalid.  The Conference argues that Plaintiff's claims represent a fundamental misunderstanding of copyright law, the copyright claims are duplicative of the breach of contract claim, and, in any

---

[12] The Court acknowledges that the court in *Mattei I* was applying Texas law, but Texas law is the same as New York law on this point.  *See Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 136 (Tex. App. 2005) (explaining that courts examine the procedural and substantive aspects of a contract in determining whether it is unconscionable).

event, Plaintiff has failed to state adequately any of these causes of action.  (Conference Mem. 30–33.)

The driving force behind Plaintiff's claims is his belief that the Conference punished him for disclosing copyrighted information.  (Pl.'s Opp'n 33.)  Plaintiff alleges broadly that the Conference does not possess copyrights to the questions contained in the NBE, and that the Conference knows that numerous NBE exam questions have been published online or in study guides.  Because many of the questions are a matter of public knowledge, Plaintiff contends that the information that he allegedly exchanged before or after taking the NBE constitutes "abstract ideas and non-confidential public knowledge not susceptible to copyright protection."  (Am. Compl. ¶ 227.)  He therefore alleges that the sharing of the information that was already in the public domain constituted fair use, or in the alternative, he had an implied license to share it.

The Court's primary concern with respect to these causes of action is whether there is a case of actual controversy.[13]  The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).  "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)).  "An actual controversy must be extant at all stages of review, not merely at

---

[13] The Conference has not explicitly argued that the Court lacks subject matter jurisdiction over these claims.  "Courts do not usually raise claims or arguments on their own. But federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press."  *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

the time the complaint is filed." *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (internal quotation marks omitted). "Throughout the litigation, the party seeking relief must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable decision." *United States v. Juvenile Male*, 564 U.S. 932, 936 (2011) (alteration and internal quotation marks omitted). The Supreme Court's "decisions have required that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune*, 549 U.S. at 127 (alteration and internal quotation marks omitted). In other words, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). "Divorced from any concrete actual or threatened harm, the parties' abstract dispute about the law . . . falls outside the scope of the constitutional words 'Cases' and 'Controversies.'" *Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 404 (S.D.N.Y. 2012) (some internal quotation marks omitted).

Courts have consistently interpreted the "permissive language" of § 2201(a) "as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear." *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003) (per curiam); *see* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such

declaration . . . ." (emphasis added)).  It is appropriate to exercise this discretion "where a declaratory judgment claim is redundant of a primary claim raised by a party to a lawsuit." *Gorfinkel v. Vayntrub*, No. 13-CV-3093, 2014 WL 4175914, at *6 (E.D.N.Y. Aug. 20, 2014); *see also First Niagara Bank N.A. v. Mortg. Builder Software, Inc.*, No. 13-CV-592, 2016 WL 2962817, at *10 (W.D.N.Y. May 23, 2016) (same).

In this Action, no "case of actual controversy" exists between the Parties.  Even if Plaintiff is successful on his copyright claims, his injuries—the 5-year ban on retaking the NBE, the invalidation of his NBE scores, and the $500 fine—cannot "be redressed by a favorable decision."  *Juvenile Male*, 564 U.S. at 936 (internal quotation marks omitted).  This is so because Plaintiff was not punished for violating the Conference's copyrights; instead, the Conference determined that Plaintiff breached the Non-Disclosure Agreement.  (*See* Conference Reply Mem. of Law in Supp. of Mot. To Dismiss 13 (Dkt. No. 41) ("The Conference's actions with respect to Plaintiff's NBE score were instead derived from its contract with Plaintiff.").)  Even if the Court were to determine that the Conference's copyrights are invalid or that Plaintiff had an implied license to distribute exam questions, the Conference would not be required to retract the punishments it imposed.  In that circumstance, the Court's decision would be purely advisory. Accordingly, Plaintiff's copyright declaratory judgment claims are dismissed.  *See Vina Casa Tamaya S.A. v. Oakville Hills Cellar, Inc.*, 784 F. Supp. 2d 391, 397 (S.D.N.Y. 2011) (dismissing complaint because there was no actual controversy).[14]

Furthermore, even if Plaintiff could demonstrate the existence of an actual controversy, the Court finds that the copyright claims are duplicative of his breach of contract claim and

---

[14] Defendants' counsel confirmed at oral argument that Plaintiff was punished for violating the Non-Disclosure Agreement, rather than for interfering with the Conference's copyrights.

would decline to exercise jurisdiction over them.  *See First Niagara Bank*, 2016 WL 2962817, at

*10; *Gorfinkel*, 2014 WL 4175914, at *6.  Plaintiff alleges that under the Test-Taker Agreement,

the Conference agreed to administer and grade the NBE and inform any chosen states of his

passing scores.  (Am. Compl. ¶ 187.)  Plaintiff claims he has upheld his end of the bargain, but

that the Conference has breached the agreement by invalidating his test scores.  (*Id.* ¶ 191.)  As

the Conference correctly notes, (Conference Mem. 31), the findings made as to the Parties' rights

under the Test-Taker and Non-Disclosure Agreements will render a declaratory judgment

superfluous.  In determining whether Plaintiff breached those contracts, the finder of fact may

have to consider whether the Conference has valid copyrights to the NBE questions that Plaintiff

allegedly shared with AAMI, but that determination can be made without a separate cause of

action for a declaratory judgment.  Plaintiff may simply raise that argument in defense of his

actions.  Accordingly, Plaintiff's copyright claims are dismissed.

### 4.  Legality of Banning Plaintiff from Retaking the NBE

Plaintiff alleges that both New York and Missouri law require that licensing examinations

for funeral directors and embalmers be held at least twice annually.  (Am. Compl. ¶ 246.)  He

therefore seeks a declaration that the five-year ban on retaking the NBE violates state law.  (*Id.*

¶ 248.)  The Conference contends that Plaintiff has failed to state a claim because he has misread

the applicable laws.  (Conference Mem. 34.)

New York and Missouri law require that the NBE be administered twice a year.  *See* N.Y.

Pub. Health Law § 3422(2) ("Examinations shall be held twice in each year."); Mo. Rev. Stat.

333.041(5) ("Examinations required by this section and [§] 333.042 shall be held at least twice a

year at times and places fixed by the board.").  Nothing in these provisions, however, mandates

that the NBE be administered to any particular individual.  These laws are also directed at the

respective funeral director licensing boards of New York and Missouri, not the Conference. Accordingly, this cause of action is dismissed. (*See Mattei II* 8–9 (rejecting a similar argument made by the plaintiff with respect to Texas law).)

## III. Conclusion

For the foregoing reasons, the Conference's Motion is granted and Orecki's Motion is denied as moot.[15] The only claim remaining in this Action is the breach of contract claim asserted against the Conference (claim 5). In light of the fact that the Court has dismissed all of the federal causes of action, the Parties are directed to file letters, not to exceed three pages, explaining whether the Court has subject matter jurisdiction to retain this case under 28 U.S.C. § 1332. If § 1332 is inapplicable, the Parties must explain why the Court should exercise supplemental jurisdiction over the breach of contract claim. The letters shall be filed by no later than March 24, 2017.

The Clerk of Court is directed to terminate the pending Motions, (Dkt. Nos. 35, 38), and to dismiss Defendant Orecki from the case.

SO ORDERED.

DATED: March 17, 2017
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[15] As this Court's ruling is grounded on Plaintiff's failure to plead a cause of action, and Plaintiff has already been provided with a second opportunity to do so, all of the claims asserted against the Conference, except for the breach of contract claim, are dismissed with prejudice. *See Denny v. Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (holding that the plaintiff was not entitled to "a third go-around"); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at *24 n.19 (S.D.N.Y. Mar. 29, 2016) (granting motion to dismiss with prejudice where "[the] [p]laintiff has already had two bites at the apple, and they have proven fruitless" (alteration and internal quotation marks omitted)).

32